IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANNA MARIE GROVER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 07-139 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

**I.    INTRODUCTION**

Pending  before  the  Court  are  cross-motions  for  summary
judgment filed by Plaintiff Anna Marie Grover and Defendant Michael
J. Astrue, Commissioner of Social Security.  Plaintiff seeks review
of  a  final  decision  by  the  Commissioner  denying  her  claim  for
Supplemental Security Income benefits ("SSI") under Title XVI of
the  Social  Security  Act,  42  U.S.C.  §§  1381,  *et  seq.*    For  the
reasons  discussed  below,  Defendant's  motion  is  denied  and
Plaintiff's motion is granted insofar as she seeks remand of this
matter for further consideration.

**II.   BACKGROUND**

A.    Factual Background

Anna  Marie  Grover  worked  intermittently  as  a  bartender,
a  clerical  assistant  in  an  insurance  agency,  a  server  in  a
restaurant, and a customer service representative for a department
store  following  her  graduation  from  high  school  in  1991.
(Certified Copy of Transcript of Proceedings before the Social

Security Administration, Docket No. 6, "Tr.," at 98, 101.) She was last employed as a part-time customer service representative from March through June 2004. (Tr. 85; 94-95.) Although she had the option of adjusting her working hours somewhat in the last position, Plaintiff stated that even with this flexibility she could not always schedule her numerous doctors' appointments and still accommodate her work schedule. Moreover, even when she was able to manage that problem, "it was no guarantee [she] would feel able to function that particular day and would have to call off." (Tr. 94.) Plaintiff quit working on July 1, 2004.

B.   Procedural Background

On August 16, 2004, Ms. Grover protectively filed for Supplemental Security Income benefits, alleging disability as of December 1, 2003, due to anxiety, depression, panic attacks, and degenerative joint disease. (Tr. 71, 84.) The Social Security Administration ("SSA") denied her application on December 1, 2004, concluding that although Plaintiff could not return to her previous relevant work as a restaurant server due to her physical and mental limitations, she would be able to perform other occupations which were available in the national and local economies. (Tr. 32-37.)

Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), which was held before Judge Douglas W. Abruzzo on October 15, 2005. Judge Abruzzo continued the hearing because Plaintiff had just begun treating with a new psychiatrist and

2

additional time was needed to fully develop the record. (Tr. 303-309.) A second hearing before Judge Abruzzo was held on January 17, 2006, at which Plaintiff was represented by counsel. The ALJ issued his decision on March 6, 2006, again denying benefits. (Tr. 13-23.[1]) On December 14, 2006, the Social Security Appeals Council advised Ms. Grover that it had found no reason under its rules to review the ALJ's decision (Tr. 5-7); therefore, the March 6, 2006 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on February 6, 2007, seeking judicial review of the ALJ's decision.

C.    Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining

---

[1]    The copy of the ALJ's decision included in the original record submitted by the Commissioner was illegible. *See* Doc. No. 16-2 for the replacement copy provided at the Court's request. The transcript page numbering is the same in both documents.

whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake de novo review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), citing Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, No. 03-3416, 2004 U.S.

4

App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV. ANALYSIS

### A. The ALJ's Determination

In determining whether a claimant is eligible for disability insurance benefits, the burden is on the claimant to show that she has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe she is unable to pursue substantial gainful employment[2] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last for not less than twelve months. Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000); 42 U.S.C. § 1382c(a)(3)(C)(I).

When considering a claimant's rights to SSI,[3] the ALJ conducts a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, she cannot be considered disabled;

(2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits

---

[2]  According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities. . . . Work may be substantial even if it is done on a part-time basis." "Gainful work activity" is the kind of work activity usually done for pay or profit.

[3]  The same test is used to determine disability for purposes of receiving either SSI or disability insurance benefits. Burns v. Barnhart, 312 F.3d 113, 119, n1 (3d Cir. 2002). Therefore, courts routinely consider case law developed for either type of benefits.

her ability to do basic work activity, she is not disabled;

(3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity ("RFC")[4] to perform her past relevant work, she is not disabled; and

(5) if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, she is not disabled.

20 C.F.R. § 416.920(a); see also Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support her position that she is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[5] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Abruzzo first concluded that Ms. Grover had not engaged in substantial gainful

---

[4] Briefly stated, residual functional capacity is the most a claimant can do despite her recognized limitations. Fargnoli v. Halter, 247 F.3d 34, 40 (3d Cir. 2001). Social Security Ruling 96-9 defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

[5] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n2, citing Bowen v. Yuckert, 482 U.S. 137, 146-147 n5 (1987).

6

activity at any time after her alleged onset date of December 1, 2003,[6] through the date of his opinion. (Tr. 17.)   In resolving step two in Plaintiff's favor, the ALJ found that as of the date of the hearing, Ms. Grover experienced mild depression, anxiety with agoraphobia, and obesity, all of which were "severe" impairments as that term is defined by the SSA. (Tr. 17.)   However, he also concluded that an injury to her left ankle which had resulted in arthroscopic surgery in May 1997, her mild to moderate carpal tunnel syndrome in both wrists, alopecia (hair loss), neck and back spasms, and headaches were not severe impairments, either because she had received no ongoing treatment for these conditions or because they had not lasted for 12 continuous months. (Tr. 17-18.)

At step three, the ALJ concluded that Plaintiff's impairments, considered singly or in combination, did not satisfy the criteria in the relevant Listings, i.e., Listing 12.04 (affective disorders) or 12.06 (anxiety disorders) and that her obesity had not resulted in signs, symptoms or limitations pertaining to orthopedic, respiratory or cardiac impairments described in Listings 1.00, 3.00 and 4.00, respectively. (Tr. 18-19.)

At step four, the ALJ concluded Ms. Grover's residual functional capacity was sufficient to permit her to work at the medium exertional level, but that her obesity precluded any work

_____

[6] The record reflects that Ms. Grover actually continued to work, at least intermittently, from March through June 2004. (Tr. 75, 84, 94, 320-321.)   The ALJ apparently concluded, however, that her last part-time job did not constitute substantial gainful employment.

7

which required balancing, kneeling, crawling, or climbing ladders, ropes and scaffolds. If performing sedentary work, she would also require a sit/stand option, i.e., the ability to stand and move away from her work station for one minute, up to five times per hour. In addition, if work required Ms. Grover to use her left leg to operate pedals, she was limited to only occasional pushing or pulling unless the action required less than five pounds of force. (Tr. 19.)

The vocational expert ("VE") who testified at the hearing, Mr. Eugene Hoffman,[7] identified Plaintiff's past relevant occupations (i.e., bartender and restaurant server) as light work[8] performed at the semi-skilled level. (Tr. 343.) The ALJ concluded that because of her non-exertional limitations, Plaintiff was restricted to unskilled work and therefore could not return to those professions. However, the VE testified that unskilled medium work as a laborer in any industry or custodian, unskilled light work as a laundry folder or laundry classifier, and unskilled sedentary work as a

---

[7] Although the ALJ's decision refers to the vocational expert as Mark Heckman (Tr. 15), according to the transcript, VE Eugene Hoffman actually appeared and testified. (Tr. 310, 342.)

[8] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities." 20 C.F.R. § 416.967(b). A person who is able to do light work is also assumed to be able to do sedentary work unless there are limiting factors such as loss of fine dexterity or the inability to sit for long periods of time. Id.

small parts assembler, insulation cutter and former (electrical insulation), and wireworker were all readily available in the local and national economies. (Tr. 345-346.) Therefore, based on Ms. Grover's status as a younger individual[9] with a high school education and her residual functional capacity, the ALJ determined at step five that Plaintiff was not disabled and, consequently, not entitled to benefits. (Tr. 23.)

Before addressing Ms. Grover's arguments why the ALJ erred in this analysis, we summarize the relevant medical evidence[10] and Plaintiff's subjective complaints based on her testimony at the hearing and her responses in a questionnaire concerning activities of daily living ("ADL") completed on August 26, 2004 (Tr. 114-125.)

B.    Medical Evidence

1.    *Degenerative Joint Disease:*    Although Plaintiff alleges that the onset date of her disability was December 1, 2003, the degenerative condition of her left ankle actually began on December 7, 1996, when she was told it had been fractured.

---

[9]    Plaintiff was 32 years old at the time of the hearing, meaning she fell within the category defined as a "younger individual," i.e., less than age 50.    20 C.F.R. § 416.963.    We further note that the ALJ found that "transferability of job skills was not material to the determination of disability due to the claimant's age."    (Tr. 22, *citing* 20 C.F.R. § 416.968.)    The referenced regulation pertains only to transferability of job skills for individuals age 55 and older, therefore, the ALJ's reasoning on this minor point is unclear.

[10]    Because the Court concludes that the focus of the ALJ's errors primarily concern her ankle condition, obesity, carpal tunnel syndrome, and agoraphobia, we have omitted medical evidence concerning her other mental impairments, hair loss, back pain and neck pain. This does not necessarily mean we agree or disagree with the ALJ's conclusions regarding the severity or impact of these conditions.

9

However, at a follow-up orthopedic examination, the injury was diagnosed only as a bad sprain; Ms. Grover was given an ankle brace and was told she could walk on the injured joint. (Tr. 265.) When she continued to experience pain in the ankle, Ms. Grover sought a second opinion from Dr. Daniel Haffner on March 21, 1997. Initial X-rays showed a separated fragment of bone or cartilage which the doctor initially attempted to repair by immobilizing her ankle in a cast, hoping the fragment would heal spontaneously. However, as soon as she was weight-bearing again, the pain returned. On May 15, 1997, Dr. Haffner performed an arthroscopy on her ankle and removed the fragment. (Tr. 152-153.) Follow-up examinations on July 7 and September 3, 1997, showed no additional loose fragments of cartilage or bone, only soft tissue swelling and osteopenia.[11] (Tr. 148-149; 259-267.)

Plaintiff returned to work in the Fall of 1998 as a server in a restaurant. (Tr. 210.) On March 2, 1999, she went to a hospital emergency room with pain in the same ankle. She was diagnosed with degenerative arthritis, sprain and occult fracture, but refused to allow her ankle to be x-rayed. She was given Motrin for pain and released. (Tr. 169.) On May 18, 2000, she returned to the emergency room with ankle pain and swelling which had begun that

---

[11] Osteopenia is the reduction in bone volume to below normal levels especially due to inadequate replacement of bone lost to normal disintegration or dissolution. *See* medical dictionary at the National Institute of Medicine's on-line website, www.nlm.nih.gov/medlineplus, "Medline Plus" (last visited August 27, 2007.)

10

day, but the record does not reflect diagnosis, treatment or follow-up. (Tr. 170.)

Soon after she began working as a customer representative for J.C. Penney Company in March 2004, Plaintiff was taken by ambulance to a hospital emergency room after she injured her ankle at work. She reported pain and swelling as the result of an inversion injury, but an x-ray revealed no significant bony abnormalities. She was given an aircast to impede activity and was told to use Tylenol and Motrin as needed for pain control. Although she was advised to follow-up with a company doctor for further care, evaluation and management, the record does not reflect any subsequent treatment. (Tr. 173, 109.)

In September 2004, Plaintiff was examined by Dr. Thor C. Mathos in connection with her application for SSI benefits. Although his examination focused on her mental impairments, he also noted "a long history of left ankle pain secondary to a fracture of her talus in 1996." Despite reports of pain on palpation of her ankle, her leg extenders and flexors showed good strength and there was no edema. (Tr. 208-211.) Dr. Mathos prescribed Vioxx, then Piroxicam and Naprosyn,[12] in an attempt to alleviate the joint pain.

---

[12] Among other uses, Vioxx (rofecoxib) is used to relieve the pain, tenderness, inflammation, and stiffness caused by arthritis. It is one of a class of nonsteroidal anti-inflammatory drugs ("NSAIDs") which work by stopping the body's production of a substance that causes pain and inflammation. In September 2004, the manufacturer voluntarily withdrew the drug from the market due to safety concerns of an increased risk of cardiovascular events in patients taking Vioxx. Piroxicam is also a NSAID used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid

He continued to treat Ms. Grover until at least June 3, 2005, with references to continuing problems with her ankle in October 2004. (Tr. 249.)

On November 9, 2004, Plaintiff returned to Dr. Haffner for the first time in about seven years. He noted that following the arthroscopy, her improvement had been "quite remarkable, allowing her to spend extended time on her feet as a bartender." At the time of the appointment, however, she had difficulty with any weight bearing on her left ankle. Plaintiff reported she had made "several visits" to emergency rooms for pain medications and x-rays in the intervening years, but had not received any orthopedic surgical recommendations, physical therapy or cortisone injections. On examination, Dr. Haffner noted a "fairly good" range of motion, no significant effusion or crepitus, and no gross instability of the collateral ligaments. The ankle was tender along the joint line and x-rays showed some osteophytic breaking on the anterior distal tibia, but no "significant" loss of joint space. Plaintiff was treated with a cortisone injection in her ankle. She was told to return in three weeks if the joint was still painful, but the record does not include any follow-up notes. (Tr. 237.)

Plaintiff was also examined by Dr. Joseph M. Lipinski on June

arthritis. Among its many uses, Naprosyn (naproxen) is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis, arthritis of the spine, bursitis, and tendinitis. See drugs and supplements information at Medline Plus.

12

1, 2005.[13] In the notes from her initial office visit on that date, Dr. Lipinski noted that arthritis in her left ankle was one reason why it was difficult for her to exercise on a regular basis, leading to her obesity. She denied any edema despite continuing pain in the ankle and knee, but on examination, Dr. Lipinski noted edema of the left ankle joint, with diminished range of motion and pain with both dorsal flexion and plantar flexion without evidence of abnormal redness or inflammation. Her lower extremities exhibited normal and symmetric strength and sensation. He also noted that she was continuing to see Dr. Haffner on a regular basis but that the cortisone injections he recommended were "only helping somewhat." (Tr. 277-278.)

At the hearing, Plaintiff testified she had quit her job in a bar because she experienced severe pain when she was on her feet for "very long periods of time." (Tr. 319.) In the ADL questionnaire, she reported that due to severe ankle pain, she could only climb eight to twelve steps, one at a time, and could not carry more than 10 pounds. (Tr. 117.) Since her initial ankle injury in 1996, she had experienced severe pain on a daily basis, which was exacerbated by "absolutely everything" (e.g., bending, standing, walking and temperature extremes.) (Tr. 121.) Over-the-counter medications and other treatments such as physical therapy, biofeedback, and hot showers had not been effective in relieving

---

[13] It is unclear from the notes if Plaintiff was examined by Dr. Lipinski himself or by Dr. Michelle Rathgeb. (Tr. 277.)

13

the pain, although she had not attended physical therapy and used an aircast only intermittently. (Tr. 122-123.) Ms. Grover stated that the continual pain limited her physical activities, including walking; as a result, she had gained almost 200 pounds, which in turn caused increased mental stress. (Tr. 124.)

2. *Obesity:* References to Plaintiff's increasing obesity occur throughout the record. At the hearing on January 17, 2006, Plaintiff testified that her normal weight at some unspecified time in the past had been 140 to 150 pounds, but that she now weighed 360 pounds. (Tr. 316.) The earliest medical comment on her weight appears in Dr. Haffner's notes from March 1997 where he referred to her as "somewhat overweight," but did not use the word "obese." (Tr. 265.) The medical records show rapid weight increases from 316 pounds on August 10, 2004 (Tr. 206), to 323 pounds on September 23, 2004 (Tr. 210), and 332 pounds on November 24, 2004 (Tr. 248.) Dr. Mathos's notes reflect that on February 14, 2005, when her weight was 341.5 pounds, he recommended that she begin treatment with Xenical.[14] However, the following day, Ms. Grover was advised that Xenical was not covered by her insurance plan and that she would have to pay for the medication "or forget about it." (Tr. 247.) On March 29, 2005, her weight was 347 pounds. (Tr. 246.) On June 1, 2005, when Plaintiff

---

[14] Xenical (orlistat) is a lipase inhibitor which is used with a low-calorie diet to lose weight and for maintenance after weight loss. *See* drugs and supplements information at Medline Plus.

14

weighed 350 pounds, Dr. Lipinski noted that

> she used to [weigh] several hundred pounds less several
> years [ago], but since been [sic] placed on disability
> and undergone her psychiatric treatment, she states that
> she has gained an enormous amount of weight.  No matter
> what she tries at this point [in] time, she cannot lose
> weight.   She has known arthritis in the left ankle
> because of prior injury and it is very difficult for her
> to exercise on regular basis.   She has tried numerous
> diets without much success and she is wondering what she
> can do at this point [in] time.

(Tr. 277.)  He further noted, "I would like to refer her to Dr.
Elias for an evaluation for gastric bypass surgery" (Tr. 278), but
there are no notes regarding such follow-up.

     3.  *Carpal Tunnel Syndrome:*  The last relevant physical

condition is Ms. Grover's bilateral carpal tunnel syndrome.[15]

Although Plaintiff testified that as of December 1, 2003, she was

already suffering from this condition, the first medical reference

---

[15]  Carpal tunnel syndrome ("CTS") occurs when the median nerve
which supplies sensation to the thumb-side of the palm, the thumb,
index finger, middle finger, and the thumb-side of the ring finger is
compressed at the point where the nerve enters the hand, i.e., the
carpal tunnel.   Since the passageway is stiff, any swelling in this
area can put pressure on the nerve.  CTS may be caused by injury to
the wrist area, repetitive manual activities (such as certain sports,
sewing, typing, driving, assembly-line work, painting, or writing),
and use of hand tools or vibrating tools, as well as by obesity and
other medical conditions.   The condition may result in numbness,
tingling, weakness, or muscle damage in the hand and fingers.
Carpal tunnel syndrome is identified by manipulating the wrist to
determine the extent of pain, numbness, tingling, and/or weakness, by
performing electromyography and nerve studies to determine conduction
velocity across the wrist, and by using x-rays to rule out other
problems, e.g., arthritis.   It is first treated by using a splint to
stabilize the wrist and cold compresses, together with NSAIDs such as
ibuprofen or naproxen and/or corticosteroid injections given into the
carpal tunnel area.   More than half of all cases eventually require
surgery known as carpal tunnel release in which the ligament pressing
on the nerve is cut.   Although such surgery is successful about 85% of
the time, full recovery to the damaged nerve may take months.   *See*
medical encyclopedia at Medline Plus.

appears in Dr. Mathos's notes of September 22, 2004, when she reported a "recent problem" with "bilateral hand and arm tingling." She also indicated that a nerve conduction study had been proposed, but "she did not have any insurance and therefore could not proceed with the testing." Dr. Mathos noted good strength in her arm extenders and flexors and there was no edema. (Tr. 209, 211.)

On November 12, 2004, Dr. Ramalingam Ravishankar performed an electrodiagnostic evaluation of Plaintiff's upper extremities. Ms. Grover reported she had experienced numbness in both hands and mild pain in her wrists for the last three or four months; all her fingers were involved and she had difficulty handling small objects. On examination, her bilateral strength was measured at 5 out of 5 in the major muscle groups in her upper extremities except for her thumb opposition which was slightly decreased in both hands. Deep tendon reflexes were 2+ and symmetrical bilaterally in her biceps and triceps with no focal muscle wasting. Electromyograms indicated that all muscles in her arms "showed normal insertional activity, normal motor unit action potential morphology, normal recruitment and interference pattern" with no evidence of spontaneous activity. Dr. Ravishankar concluded his findings were "consistent with bilateral mild to moderately severe carpal tunnel syndrome. The findings are predominantly of

demyelination.[16]  The patient is likely to benefit from the use of wrist splints initially." (Tr. 239-240.)  The only suggestion that Plaintiff might require surgery to alleviate her symptoms appears to be a note by Dr. Mathos from a follow-up appointment on November 24, 2004, that if use of splints provided no relief, he would "refer [her] to osteo for decompression." (Tr. 248.)

Plaintiff testified at the hearing that she had been "bothered by" carpal tunnel syndrome in both hands as of December 2003. During a psychiatric evaluation in July 2004, she reported that she had begun experiencing numbness in her hands while sleeping a year earlier. (Tr. 193.)  In the ADL questionnaire completed in August 2004, she reported that although she could perform fine manual movements such as dialing a touch-tone telephone, using a TV remote control and silverware, tying shoes, and fastening buttons, her hands had lately "been going numb" and she intended to consult a doctor about this condition. (Tr. 117.)  Ms. Grover testified that by January 2006, she did not have enough strength in her hands to dust, sweep or mop a floor, wash dishes, carry a basket of laundry, or take out the trash. (Tr. 326-327.)  When she did not wear the prescribed splints, her "hands curl up into fists," and she experienced sharp pain between her thumb and forefinger if she attempted to grip anything. (Tr. 331, 333.)  She also stated that

[16]  Demyelination is a condition resulting from the loss or destruction of myelin, the soft white, somewhat fatty, material that forms a thick sheath around the protoplasmic core of some nerve fibers.  See medical dictionary at Medline Plus.

17

"most everything I want to do, I need my hands and if I take the splints off, it's not long before they're stiff and I can't do it anyway.   It's hard to do anything with them."   (Tr. 329.)   She testified that she wore the splints 24 hours a day (including while she was sleeping) except during "four or five minute" periods when she removed them to bathe, wash her hands, "throw laundry in or out," or write.   (Tr. 332-333.)

         4.   *Agoraphobia:*   The earliest medical evidence of Plaintiff's agoraphobia[17] dates from July 12, 2004, when she sought counseling for depression and anxiety at Westmoreland Casemanagement [sic] and Supports, Inc.   She reported she had been experiencing "almost daily" panic attacks and anxiety attacks for the last nine months.   During the attacks, she had palpitations, an accelerated heart rate, shaking or trembling, and shortness of breath.   She was unable to drive, go out in crowds, or go out alone.   Ms. Grover was diagnosed with depressive disorder NOS. (Tr. 201.)

     Plaintiff began treating at the Westmoreland Comprehensive Counseling Center ("WCCC") on August 10, 2004.   On August 20, 2004,

_____

[17]   Among the many symptoms of agoraphobia are fears of being alone, of losing control in a public place, or of being in places where escape might be difficult; becoming housebound for prolonged periods of time; feeling detached or estranged from others; feeling helpless; and dependence on others.   Agoraphobia often accompanies another anxiety disorder; in more than one-third of all cases, it develops from panic disorder (i.e., repeated and unpredictable attacks of intense fear and anxiety.)   Agoraphobia is usually treated with a combination of anti-anxiety or anti-depression medication and psychotherapy.   *See* medical encyclopedia at Medline Plus.

18

she "described a long [history] of problems getting to work," and increasing panic attacks which made her reluctant to leave the house. She was described, however, as appearing motivated to return to work. On August 30, 2004, she was unable to drive herself to her appointment for unexplained reasons. Her next appointment was cancelled and rescheduled for September 10, 2004, but the Court has been unable to find any notes pertaining to an appointment on that date. (Tr. 204-205.)

During her physical examination by Dr. Mathos on September 22, 2004, Plaintiff reported that her anxiety and panic "had been especially problematic since November 2003." The severity of the attacks waxed and waned, but she sometimes felt she could not go out in public, did not like crowds, and did "not feel that she [could] work on any kind of a schedule because of her fatigue." (Tr. 208.) She was able to shop for groceries only "when she is accompanied by the boyfriend because she does not like to go out of the house alone.... She states that she is able to get along with people but really does not like to be out in the public interacting with people. She did drive herself to my office today unaccompanied for appointment." (Tr. 210.) Dr. Mathos commented that the basis of her application for Social Security benefits was "primarily because of emotional difficulties with anxiety and panic. I suspect that she has depression and agoraphobia as well." (Tr. 211.) He further noted she had been seeing a counselor at the WCCC "on a weekly basis over the last six weeks," and was scheduled

19

to see a psychiatrist in October.  (Tr. 208-209.)

On October 14, 2004, Ms. Grover participated in a consultative psychological examination by Tim Bridges, Ph.D.  (Tr. 212-218.) Plaintiff reported that to date she was not satisfied with her therapy at WCCC since it appeared to involve nothing more than deep breathing exercises.  She also reported she had recently begun experiencing severe anxiety attacks and symptoms, i.e., increased pulse rate and blood pressure.  She had become fearful of leaving her home and generally needed to be accompanied by others in order to go out.  Although she reported no social problems getting along with others, when she was allowed to arrange her own schedule at her last job, she "preferred not to work."  Dr. Bridges found "no significant concerns regarding her ability to socially integrate with the exception of frequent nervousness."  (Tr. 215.)  His diagnoses at that time were panic disorder with agoraphobia, dysthmyic disorder, early onset,[18] and "occupation problem."  (Id.) He further concluded her ability to respond appropriately to supervision, co-workers and work pressures was "slightly affected" due to depression and moderate panic attacks.  (Tr. 218.)

---

[18]  Dysthymic disorder is a chronic form of depression characterized by moods that are consistently low, but not as extreme as in other types of depression.  Symptoms include low self-esteem, despair and hopelessness.  Its exact cause is unknown but it may occur in conjunction with other mood or psychiatric disorders.  The most effective treatment is a combination of medication with cognitive/ behavioral or interpersonal therapy.  See medical encyclopedia at Medline Plus.

20

Dr. Donald P. Breneman performed a psychiatric evaluation on October 18, 2004, apparently through the auspices of WCCC. At that time, her chief complaints were anxiety, depression, and fears of leaving home. He commented that

> unfortunately she seems to have had longstanding patterns of marked dependency. She states that she can't mobilize herself to really work. She doesn't remain at a job. She has no real career plans. She sees symptoms really beginning around early puberty and persisting throughout her life. They have led her to try to avoid stressful situations and to be cared for by others. At the present time she really doesn't know how often panic attacks occur. She reports some difficulty mobilizing herself to even get out of the house.

(Tr. 272.)   He further commented, "She states at times she is somewhat fearful to go out.... She claims that she wants to be more independent but much of her life is arranged so that this cannot occur." His diagnoses were depressive disorder NOS and personality disorder with passive dependent features. Although Lexapro[19] had been helpful in decreasing her panic attacks, she had an "extremely low level of motivation," and Dr. Breneman opined that "perhaps participation in a support group and other community activities would be of value in changing her lifestyle." (Tr. 274.)

On November 1, 2004, Dr. Edward Zuckerman reviewed Plaintiff's medical records to date and found that despite her diagnosis of

---

[19]   Lexapro (escitalopram) is used to treat depression and generalized anxiety disorder. It is one of a class of antidepressants called selective serotonin re-uptake inhibitors which work by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance. *See* drugs and supplements at Medline Plus.

panic disorder with agoraphobia, she had no more than moderate limitations in any aspect of concentration and pace, social interaction, or adaption. (*See* Tr. 219-235.) As a result of giving "great weight" to Dr. Bridges's opinion,[20] he concluded that Plaintiff was "somewhat socially avoidant but not completely agoraphobic" and could meet the basic mental demands of competitive work on a sustained basis. (Tr. 234.)

Ms. Grover returned to Dr. Bridges's practice as of December 6, 2004, presumably to begin long-term therapy. However, after the initial assessment, she cancelled her next appointment on December 13, 2004, and failed to schedule further appointments. Her status as a patient was consequently terminated on January 21, 2005. (Tr. 242-243.) However, on February 14, 2005, Plaintiff asked Dr. Mathos to provide in-home psychiatric counseling because she stated "she can't go up there [i.e., to Dr. Bridges's office] for counseling [due to] agoraphobia. (Tr. 247.) Dr. Mathos complied with this request and by April 2005, she was seeing an in-home psychiatric nurse. (Tr. 246.)

On June 1, 2005, during the examination by Dr. Lipinski, Plaintiff reported despite taking Lexapro, she had break-through anxiety "at least 3 times per week" and at times developed "almost panic-type symptoms." Dr. Lipinski prescribed the anti-anxiety drug Ativan for her intermittent symptoms. (Tr. 277-278.)

---

[20] If Dr. Zuckerman reviewed Dr. Breneman's evaluation of October 18, 2004, it is not mentioned in his report.

Ms. Grover underwent yet another psychiatric evaluation on July 8, 2005, performed by Martha Yablonsky, an associate of Dr. Patricia Passeltiner, a psychiatrist.    (Tr. 291-293.)   At that time, Plaintiff stated she wanted "structure in her life [and] to be able to . . . go to work."   She reported she had not experienced panic attacks since she was prescribed Lexapro by Dr. Mathos in July 2004.   However, she also told the therapist she could not regulate her moods and needed the "constant presence and comfort of a significant other to tolerate the outside world."   (Tr. 293.) Ms. Yablonsky's primary diagnosis was major depressive disorder, recurrent, severe without psychotic features, and moderate occupational problems.   (Tr. 293.)   During a medication check on September 16, 2005, Dr. Passeltiner described Plaintiff's diagnoses at that time as generalized anxiety disorder, social phobia generalized, and panic disorder with agoraphobia.   She was not keeping her appointments.   (Tr.   288-290.)   In October 2005, Plaintiff reported she was not able to sleep through the night and was depressed although Lexapro had eliminated her panic attacks. Her diagnoses were unchanged.   (Tr. 285-287.)

In the ADL questionnaire, Plaintiff referred to her inability and/or reluctance to leave her home, but stated this was due to not feeling well, not specifically to agoraphobia.   (Tr. 114.)   She indicated she had stopped "going outside, playing pool, swimming, [and] going out alone."   (Tr. 116.)   She had also stopped participating in activities with family and friends because they

were "too stressful." She could not be out in public with crowds or somewhere she had never been before. She had been fired due to absenteeism as a result of her condition. On some days, she could not complete tasks which involved leaving the house. Schedule changes, disagreements with other people, or criticism caused panic and anxiety attacks. (Tr. 118-119.)

At the hearing, Plaintiff described depression, anxiety and agoraphobia as her most serious impairments as of December 1, 2003. (Tr. 321.) She stated that when she left her house, she experienced panic attacks which involved "breathing real heavy," accelerated heart rate, feeling lightheaded, and the inability to catch her breath. Most of her time was spent at home except when someone else took her to doctor or therapy appointments. (Tr. 331.) When, for instance, she had a doctor's appointment, she sometimes became "very panicky and jittery" to the point she could only go to the appointment if someone else took her. (Tr. 334.) Although she continued weekly therapy sessions with Ms. Yablonsky under Dr. Passeltiner's supervision, she also had in-home meetings with a psychiatric nurse once or twice a week. (Tr. 334-336.)

C.    Plaintiff's Arguments

Ms. Grover raises five arguments in the brief in support of her motion for summary judgment. (See Docket No. 11, "Plf.'s Brief.") First, she claims that the ALJ erred by concluding her allegations of disability were not entirely credible. (Id. at 11-19.) Second, the ALJ erred at step two of the sequential analysis

where he found Plaintiff's degenerative joint disease in her left ankle and bilateral carpal tunnel syndrome were not severe impairments. (Id. at 19-22.) Third, the ALJ erred by failing to give controlling weight to Dr. Passeltiner's opinion. (Id. at 22-25.) Consequently, by failing to adopt that opinion regarding the severity of Plaintiff's mental impairments, the ALJ erred at step three in finding she did not satisfy Listing 12.04 or 12.06. He further erred at this step by failing to recognize that obesity had a significant impact on her other body systems, particularly the left ankle. (Id. at 25-29.) Finally, Judge Abruzzo erred at step five by concluding Plaintiff retained sufficient RFC to perform medium-level unskilled work on a sustained basis. (Id. at 29-31.)

The Court concludes that the ALJ erred at four points in his analysis, albeit not necessarily for the reasons proposed by Ms. Grover. First, we find that he failed to take fully into consideration the effects of Plaintiff's obesity on her ability to perform substantial gainful activity on a continuous basis. Second, he erred at step five of his analysis by failing to include (1) physical limitations due to Plaintiff's bilateral carpal tunnel syndrome and (2) non-exertional limitations associated with agoraphobia. As a result, he erred by accepting as substantial evidence the testimony of the vocational expert which, in itself, included numerous errors. We address each of these conclusions in turn.

   1. *The ALJ's failure to properly consider the effects of*

*Plaintiff's obesity:*  Ms. Grover first contends that the ALJ erred by failing to conclude at step two of his analysis that the degenerative joint disease in her left ankle was a severe impairment.  Relying on Newell v. Comm'r of Soc. Sec., 347 F.3d, 541, 546 (3d Cir. 2003), Plaintiff argues that the AlJ's determination was clearly not supported by substantial evidence and that he improperly minimized the impact of this condition in concluding she was not disabled.  (Plf.'s Brief at 20-22.)  She further argues that although the ALJ found her obesity to be a severe impairment, he erred by failing to analyze its effect on her other body systems pursuant to Social Security Ruling ("SSR")[21] 02-01p, "Evaluation of Obesity."  According to Ms. Grover, when considered in combination with her obesity, her other impairments meet or equal some unidentified Listing(s) and she should have been considered presumptively disabled at step three of the analysis.  (Id. at 28-29.)  While we do not agree with entirely with this argument, we do find the omission of any discussion consistent with SSR 02-1p sufficiently troubling so as to require remand.

In his analysis, the ALJ summarized Ms. Grover's injury to her ankle in 1996 and its treatment through November 2004, concluding

---

[21]  "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'"  Sykes, 228 F.3d at 271, citing 20 C.F.R. § 402.35(b)(1).  "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same."  Sykes, id., quoting Heckler v. Edwards, 465 U.S. 870, 873 n3 (1984).

that her ankle problems and need for treatment had been sporadic and that the condition did not constitute a severe impairment lasting for 12 continuous months. (Tr. 17.[22] ) However, Judge Abruzzo acknowledged this impairment by restricting her to occupations which did not require more than "occasional pushing and pulling with the lower left extremity to include the operation of pedals unless such work requires less than five pounds of force." (Tr. 19.)

In his summary of the medical evidence, the ALJ also recognized Plaintiff's obesity, noting that this condition had not resulted in signs, symptoms or limitations as described in Listing 1.00 pertaining to impairments of the musculoskeletal system. (Tr. 18.) He concluded Ms. Grover's "severe physical problem is her obesity" (Tr. 21), and incorporated this impairment into the hypothetical question by restricting her to occupations which did not require balancing, kneeling, crawling, or climbing ladders, ropes and scaffolds (Tr. 22.)

We conclude, however, that the ALJ erred in his analysis by failing to consider (or, if he did consider, by failing to explain) his application of the guidelines related to obesity as set out in

_____

[22] Although the ALJ summarized her treatment in detail, we do question two of his conclusions. His finding that she had not been treated with injections or anti-inflammatory medications is contradicted by the records of cortisone injections by Dr. Mathos and use of the NSAIDs Piroxicam and Naprosyn. His comment that she retained a "fairly good range of motion" is accurate as of November 2004 (see Dr. Mathos's note at Tr. 237), but in June 2005, Dr. Lipinski found "diminished [range of motion] with both dorsal flexion and plantar flexion" (Tr. 276.)

27

SSR 02-1p. As the ALJ correctly noted, obesity, *per se*, is no longer included in the Listings, having been deleted in 1999 after the SSA concluded the criteria in Listing 9.09 "did not represent a degree of functional limitation that would prevent an individual from engaging in any gainful activity." SSR 02-1p at 1. However, the Administration also noted that obesity would be considered as a causing or contributing factor when evaluating the musculoskeletal, respiratory, and cardiovascular Listings, and established procedures for adjudicators to apply when there was medical evidence of obesity or when it was obvious to the adjudicator that the claimant was obese. Id.

According to the guidelines published by the National Institutes of Health and relied upon by the SSA, a Body Mass Index[23] of 40 or greater reflects "extreme" obesity which represents the greatest risk for developing obesity-related impairments, although it does not correlate with any specific degree of functional loss. SSR 02-1p at 2. Obesity is recognized as a risk factor which increases or complicates chronic conditions, including those of the musculoskeletal system, and which may cause or contribute to mental

---

[23]   Body Mass Index ("BMI") is the ratio of an individual's weight in kilograms to the square of her height in meters. *See* "Clinical Guidelines on the Identification, Evaluation and Treatment of Overweight and Obesity in Adults," National Institutes of Health Publication No. 98-4083, September 1998, cited in SSR 02-1p at 2. Using an on-line calculator provided by the Centers for Disease Control which determines BMI using pounds and inches (*see* "Tools and Resources" at www.cdc.gov, last visited August 27, 2007), the Court has calculated that given Ms. Grover's height of 65.75 inches and her reported weight on various dates between August 2004 and January 16, 2006, as noted in the text above, her BMI ranged from 52.5 to 58.9.

impairments such as depression.  SSR 02-1p specifically notes that obesity should be considered in determining if an individual's impairment is severe.  Id. at 3.

The guidelines direct an ALJ to "do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe."  SSR 02-1p at 4. This includes the impact on co-existing or related impairments, the effects of obesity on exertional functions, postural functions, the ability to manipulate using the fingers and the ability to tolerate environmental conditions.  The ALJ must also consider the effect on a claimant's ability to do sustained work activities on a regular and continuing basis, i.e., for 8 hours a day, 5 days a week or an equivalent schedule.  SSR 02-1p at 6.

Listing 1.00 details how the effects of obesity should be considered in ascertaining impairments to a claimant's musculoskeletal system.  It notes:

Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system and disturbance of this system can be a major cause of disability in individuals with obesity.   The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

Listing 1.00Q.

29

In this case, although the ALJ recognized Plaintiff's obesity and excluded numerous postural functions from the types of work Plaintiff theoretically could perform, there is no recognition of the effect of her obesity (1) on her ability to stand or ambulate effectively given the condition of her left ankle, or (2) on her ability to work on a regular and continuing basis.  The ALJ did recognize that her ankle impairment would limit her ability to use a foot pedal with her left leg  (Tr. 19), but there is no evidence that he considered the effect of her obesity otherwise in determining that her ankle impairment was not severe.  For instance, the VE testified that for medium level work, an individual would need to be "stand, walk or move around" for six to six and three-quarters hours in an eight hour day, and for light jobs, approximately four hours a day.  (Tr. 347.)  The Court is unable to identify in the ALJ's decision any consideration of Plaintiff's obesity on her ability to perform at this level, given the degree of impairment in her ankle.

The Court further notes that the ALJ concluded Ms. Grover had "worked with this condition [i.e., her obesity] in the past and that such condition does not keep her from engaging in a variety of household chores."  (Tr. 21.)  While it may be true that Plaintiff worked while she was overweight or obese, there appears to be no medical evidence to support this finding, that is, the explicit medical evidence concerning her obesity dates from the period after she had stopped working.  Moreover, even if she worked while she

was obese, such a conclusion does not preclude the possibility that her obesity was a contributing factor in her undeniably sporadic work history.   While Plaintiff did perform a variety of household chores, she reported in her ADL questionnaire that although she maintained a clean house, she needed "frequent rest periods [and] naps before it's done" and that she needed to rest after making a bed, cooking, shopping, or washing dishes (Tr. 116-117), a requirement which may also correlate with her obesity.

We conclude that because the ALJ failed to discuss how he evaluated the effect of Plaintiff's obesity in accordance with SSR 02-1p, the Court is unable to determine the extent to which he took into account the guidelines set forth in that Ruling. Although the Third Circuit Court of Appeals has clearly explained that an ALJ need not "use particular language or adhere to a particular format," his decision "read as a whole" must be capable of providing meaningful judicial review. Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004); see also Przegon v. Barnhart, CA No. 04-5313, 2006 U.S. Dist. LEXIS 8924, *10 (E.D. Pa. Mar. 6, 2006), remanding, in part, because the ALJ failed to explain his assessment of the effect of obesity on the claimant's ability to perform physical activity within the work environment; DeGraphenreed v. Barnhart, CA No. 04-1802, 2005 U.S. Dist. LEXIS 12061, *9 (E.D. Pa. May 26, 2005), remanding where the ALJ failed to provide a complete discussion of the claimant's obesity pursuant to SSR 02-1p; and Segal v. Barnhart, 342 F. Supp.2d 338, 341-342

31

(E.D. Pa. 2004), remanding where the ALJ failed to discuss the claimant's obesity in terms of its possible impact on her ability to perform basic work activities. The Court declines to accept Plaintiff's argument that had the ALJ properly considered the effects of obesity on the degenerative joint condition of her left ankle, he would have determined that she satisfied one of the musculoskeletal listings; rather, we leave the detailed application of SSR 02-01p to the ALJ on remand.

2. *The ALJ's failure to consider limitations caused by Plaintiff's carpal tunnel syndrome:* In his analysis, the ALJ noted that Plaintiff had been diagnosed with mild to moderate carpal tunnel syndrome for which the only treatment to date had been splints on both hands. This treatment had been "centered around November 2004," and there had been no follow-up treatment, e.g., operative procedures or physical therapy. Consequently, he concluded that this impairment was not severe. (Tr. 17.)

Although Plaintiff again argues that the ALJ erred at steps two and three by finding that her carpal tunnel condition was not severe and that it did not satisfy one of the Listings, we find instead that the ALJ's error was his complete omission of the implications of this impairment in his hypothetical question at step five. Judge Abruzzo asked the vocational expert to

consider a hypothetical individual of the same age, education and work experience as the Claimant.... This person would be limited to no more than the medium range of exertion as that is defined in our regulations. This person is restricted to no climbing of ropes, ladders and

32

scaffolds, no balancing, and no kneeling and no crawling. If you consider sedentary occupations, they must be compatible with a sit, stand, and walk option that is defined as no more than five steps away from the work station, performing a stretching [or] pain reduction maneuver, returning to the work station within one minute, doing this no more than five times each hour. This person is limited to no more than occasional pushing and pulling....with the lower left extremity to include the operation of pedals unless the pedal requires less than five pounds of force to actuate, or put another way if the pedal requires less than five pounds it can be frequent, if it's five pounds or more it can be no more than occasionally[24]....This person would be limited to simple routine and repetitive tasks and limited to occasional interaction with supervisors and co-workers.

(Tr. 343-344.)

The Third Circuit Court of Appeals has "stated in the clearest of terms that an ALJ's hypothetical must include all of a claimant's impairments." Ramirez v. Barnhart, 372 F.3d 546, 552 (3d Cir. 2004), citing Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987) ("[a] hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." Where the medical record contains undisputed evidence of specific impairments which the ALJ fails to include in his hypothetical question to a vocational expert, the expert's response cannot be considered substantial evidence. Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002). As the Court of Appeals has also pointed out, references to "all

---

[24]   The Court is unable to identify any medical evidence from which the ALJ inferred the five-pound limit on Plaintiff's ability to operate a pedal with her left leg.

impairments" encompass those which are "medically established." Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005); *see also* Burnett v. Commissioner of SSA, 220 F.3d 112, 122 (3d Cir. 2000), noting that the "ALJ must consider the combined effect of multiple impairments, regardless of their severity."

In this case, there is no question that Plaintiff had been diagnosed with mild to moderate bilateral carpal tunnel syndrome for which she had been prescribed splints.[25]  The Court has been unable to identify any medical evidence which contradicts her testimony that she wore these continuously except for brief periods during the day and when they interfered with her sleep. (Tr. 332-333.)  While the ALJ's observation that she had not been prescribed physical therapy or surgery is accurate, that point goes to the severity of her condition, not to its existence. Consequently, the ALJ's failure to incorporate this impairment into the hypothetical question posed to the VE casts doubt on his conclusion at step five that there were numerous occupations which Plaintiff could be expected to perform despite her impairments. This omission is of particular concern because five of the seven positions identified by the VE in response to the question appear to require considerable manual dexterity, i.e., laundry folder (DOT 369.687-018), laundry classifier (DOT 361.687-014), wireworker (DOT 728.684-022), assembler of small products (DOT 706.684.022 or

---

[25]  Although there is no evidence she had been prescribed anti-inflammatory drugs specifically for carpal tunnel syndrome, the record is clear that she was already taking NSAIDs for her ankle condition.

739.687-030, referred to by the VE as a "small parts assembler") and insulation cutter and former (DOT 721.484-018.) *See* job descriptions at *Dictionary of Occupational Titles* ("DOT"), revised 4th edition, provided by the U.S. Department of Labor at www.occupationalinfo.org (last visited August 22, 2007.)

On remand, the ALJ should include in his hypothetical question those limitations on Plaintiff's use of her hands which are supported by the medical evidence. We recognize that certain conflicts exist in the evidence about the onset date of this impairment, i.e., Plaintiff's testimony at the hearing that she had "been bothered" by carpal tunnel syndrome as early as December 1, 2003, her comment in the ADL questionnaire of August 2004 that her hands had "lately" been numb, and the medical evidence which first reflects the diagnosis of carpal tunnel syndrome in September 2004. On remand, we expect the ALJ will take these conflicts into account in determining the onset date of Plaintiff's disability, if the complete analysis shows she is truly disabled.

   3.   *The ALJ's omission of limitations due to Plaintiff's agoraphobia*: We also question the ALJ's description of jobs which a person with Plaintiff's limitations could perform as requiring only "simple routine and repetitive tasks" and no more than "occasional interaction with supervisors and co-workers." These restrictions presumably relate to Plaintiff's medically determined mental limitations, i.e., depression, anxiety, and agoraphobia with panic attacks. Although the ALJ discussed Plaintiff's agoraphobia

in detail (Tr. 18-21), and determined that it was a serious impairment, it is unclear if he intended these phrases to encompass limitations caused by agoraphobia or if this impairment was also overlooked when posing the hypothetical question. See Ramirez, 372 F.3d at 552-555, addressing at length the question of whether the hypothetical question adequately captured and conveyed all of a claimant's mental limitations with the "great specificity" and "detailed assessment" required by SSR 96-8p, "Assessing Residual Functional Capacity in Initial Claims," and by Burns, 312 F.3d at 122. On remand, the ALJ should reconsider this issue and any hypothetical question posed should incorporate all limitations related to Plaintiff's agoraphobia which are supported by the medical evidence.

4. *The VE's response to the ALJ's hypothetical question:* In addition to the omission of limitations imposed by Plaintiff's bilateral carpal tunnel syndrome and agoraphobia, we find several other errors stemming from the hypothetical question. First, we note that the ALJ concluded Plaintiff was capable of performing work at the medium exertional level. (Tr. 343.) According to Social Security regulations, medium work involves lifting no more than 50 pounds at a time with frequent lifting and carrying of objects weighing up to 25 pounds, and the ability to stand and/or walk six hours in an eight-hour workday. 20 C.F.R. § 416.967(c); SSR 83-10. To the best of the Court's ability to discern from a careful reading of the record, there is no medical evidence to

support this conclusion by the ALJ. To the contrary, the SSA's own preliminary analysis determined she could work at the light exertional level and noted that "the assessed RFC's lifting, carrying and nonexertional restrictions do not permit the return to past relevant work." (Tr. 32; *see also* Tr. 343 where the VE classified her past occupations (bartender and restaurant server) as semi-skilled light work.) A physical RFC assessment performed in November 2004 (which the ALJ did not mention in his analysis) also indicated an ability to occasionally lift and carry no more than 20 pounds (Tr. 128), a finding which is consistent with the ability to perform light, not medium, work.

Second, the Court finds the testimony of the vocational expert contained numerous errors which precludes its consideration as substantial evidence at step five of the ALJ's analysis. In response to the question of what medium-level exertional work a person with Ms. Grover's limitations could perform, the VE identified "labor in any industry" and "custodial work." (Tr. 345.) The Court has been unable to identify any such vague titles in the DOT. In Burnett, the Court of Appeals rejected an attempt by the ALJ to recharacterize the claimant's past occupation in order to make it fit the DOT description and thus support his conclusion that she could return to her previous position as a delicatessen clerk. The Court noted that although DOT "descriptions can be relied upon -- for jobs that are listed in the DOT -- to define the job as it is usually performed in the national

economy. . . [a]n illusory definition in the DOT cannot be relied upon and is not contradictory evidence." Burnett, 220 F.3d at 124. It follows that if a purported job title does not appear in the DOT and the ALJ or vocational expert fails to identify it by code number, the reviewing court is unable to determine if the proposed occupation satisfies the criteria of the hypothetical question. Since these were the only medium-exertion positions identified by the VE and these positions are not readily confirmed as consistent with the DOT, the Court concludes that the ALJ erred by accepting this testimony as substantial evidence that Ms. Grover could perform medium-level work.

Moreover, the position of insulator cutter/former (electrical equipment) is described in the DOT as having a specific vocational preparation ("SVP") rating of 3, reflecting 1 to 3 months of training, i.e., "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Positions rated at SVP 3 are semi-skilled positions, a category which the ALJ explicitly excluded from consideration when he limited Plaintiff to unskilled jobs, i.e., those which correspond to an SVP of 1 or 2. See SSR 00-4p, "Use of Vocational Expert and Vocational Specialist Evidence and Other Reliable Occupational Information in Disability Decisions," at 2, and 20 C.F.R. § 416.986, describing unskilled work as that which "needs little or no judgment to do simple duties that can be

38

learned on the job in a short period of time.... [A] person can usually learn to do the job in 30 days." Therefore, the VE's testimony that this position both satisfied the ALJ's hypothetical criteria and was consistent with the DOT is clearly erroneous.

Finally, as discussed in detail above, had the hypothetical question taken into account Plaintiff's carpal tunnel syndrome, the five light or sedentary jobs[26] described by the VE would most likely have been eliminated from consideration.

## V.   FURTHER PROCEEDINGS

Under 42 U.S.C. § 405(g), a district court may, at its discretion, affirm, modify or reverse the Secretary's final decision with or without remand for additional hearings. However, the reviewing court may award benefits "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits." Krizon v. Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), quoting Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir. 1984).

Here, several questions remain regarding whether Plaintiff

---

[26] The VE acknowledged that the jobs of wireworker, assembler of small products, and insulation cutter/former were actually described in the DOT as light exertion jobs. He relied on his own experience with vocational surveys and job placements, however, to describe them as being performed at the sedentary level on occasion. (Tr. 348-349.) This inconsistency alone would not necessarily be grounds for remand because a person who is capable of performing light work is also presumed to be able to perform sedentary work "unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." See 20 C.F.R. § 416.967(b).

could perform some type of work despite her limitations. The Court concludes that remand is the most appropriate resolution so that the ALJ may clarify his analysis regarding the effect of Plaintiff's obesity on her ability to perform substantial gainful activity on a regular and continuous basis, particularly with regard to requirements for standing and walking. This may require soliciting the opinion of an expert in this area of medical specialization, which we strongly urge the ALJ to consider. Should an additional hearing be deemed necessary, any question posed to a vocational expert should incorporate all of Plaintiff's physical and mental limitations supported by the medical evidence, e.g., her carpal tunnel syndrome and agoraphobia, as well as the other limitations previously included by the ALJ.

The Court explicitly declines to consider the other arguments which have been raised by Ms. Grover, concluding that the ALJ will have the opportunity to reassess Plaintiff's credibility and re-weigh (if necessary) all medical opinions on remand.

An appropriate order follows.

August ____30____, 2007

William J. Standish
William L. Standish
United States District Judge

cc:  Counsel of Record

40